**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **In re:** | : | **CHAPTER 11** |
| | : | |
| **MID-ATLANTIC ENERGY CONCEPTS, INC.** | : | **Bky. No. 18-14790(REF)** |
| **d/b/a ATLANTIC ENERGY CONCEPTS** | : | |
| | : | |
| **Debtor** | : | |
| | : | |

**MOTION OF MID-ATLANTIC ENERGY CONCEPTS, INC., DEBTOR-IN-POSSESSION FOR ENTRY OF (I) AN ORDER (A) APPROVING STALKING HORSE ASSET PURCHASE AGREEMENT FOR THE SALE OF DEBTOR'S ASSETS; (B) APPROVING BIDDING PROCEDURES, AND FORM, MANNER AND SUFFICIENCY OF NOTICE; (C) APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) SCHEDULING (1) AN AUCTION SALE AND (2) A HEARING TO CONSIDER APPROVING THE HIGHEST AND BEST OFFER; AND (E) GRANTING RELATED RELIEF; AND (II) ORDER AUTHORIZING THE DEBTOR TO SELL ITS ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS; (B) AUTHORIZING DEBTOR TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF**

Mid-Atlantic Energy Concepts, Inc. d/b/a Atlantic Energy Concepts (the "Debtor" or "Seller")[1], by and through its proposed undersigned counsel,  hereby submits this motion ("Motion") for entry of an order (A) approving stalking horse asset purchase agreement for the sale of the Debtor's assets; (B) approving bidding procedures and form, manner and sufficiency of notice; (C) approving procedures for assumption and assignment of executory contracts and unexpired leases; (D) scheduling (1) an auction sale and (2) a hearing to consider approving the highest and best offer; and (E) granting related relief (the "Bidding Procedures Order"); and (II) an order (A) authorizing the Debtor to sell its assets free and clear of liens, claims, and interests; (B) authorizing the Debtor to assume and assign certain executory contracts and unexpired leases; (C) granting related relief (the "Sale Order").  In support of the Motion, the Debtor respectfully represents as follows:

---

[1] This Motion does not include the businesses or assets of the affiliated Debtor:  LaraLynn L.P.

## JURISDICTION AND VENUE

1.      The statutory predicate for the relief requested herein is §§105, 363 and 365 of the Bankruptcy Code, and Fed. R. Bankr. P. 2002, 6004, 6006 and 9013.

2.      The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§157 and 1334.  This is a "core" proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (M), (N) and (O).

3.      Venue is proper in this Court pursuant to 28 U.S.C. §§1408 and 1409.

## BACKGROUND

4.      On July 20, 2018 (the "Petition Date"), the Debtor and its affiliated Debtor, LaraLynn L.P. ("LaraLynn") filed voluntary petitions for relief pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

5.      Since the Petition Date, the Debtor has remained in possession of its assets and continues in the management of its business as debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

6.      No trustee or examiner has been appointed in the Debtor's' Chapter 11 case.

7.      No Official Committee of Unsecured Creditors has been appointed by the United States Trustee.

8.      A description of the Debtor's business and the facts precipitating the filing of its Chapter 11 proceeding is set forth in the Declaration of Kenneth R. Field in Support of First Day Motions (the "Kenneth Declaration") and a description of the LaraLynn Debtor's business and the facts precipitating the filing of its Chapter 11 proceeding is set forth in the Declaration of Brendon R. Field in Support of First Day Motions (the "Brendon Declaration" and collectively with the Kenneth Declaration, the "Declarations").   Those facts, to the extent relevant, are incorporated herein by reference.

2

9.      As a result, outside of a bankruptcy proceeding, the Debtor is unable to sell its assets "free and clear" of liens, claims and interests.

10.      Prior to the Petition Date, the Debtor and Schaedler or its designee (the "Stalking Horse Bidder") agreed upon terms of a stalking horse asset purchase agreement (the "Stalking Horse APA") for the sale of the Debtor's assets, which is attached as Exhibit "4" to the Bidding Procedures Order.  The Bidding Procedures is attached as Exhibit "A".

11.      The Debtor believes that a chapter 11 filing, together with approval of the Bid Procedures as requested herein, will allow the Debtor to sell its assets in the most cost effective and efficient means.

A.      **Summary of the Material Terms of the APA**

12.      Pursuant to the terms and subject to the conditions of the Stalking Horse APA, the Debtor, subject to a Court-approved auction and sale process in accordance with the bidding procedures attached as Exhibit 1 to the Bidding Procedures Order (the "Bidding Procedures"), will sell to the Stalking Horse Bidder its right, title and interest in an to certain assets described herein and, in connection therewith, assign to the Stalking Horse Bidder certain contracts and leases.  The Stalking Horse Bidder will purchase the identified assets and acquire assumed contracts and leases free and clear of liens, claims and interests pursuant to sections 363 and 365 of the Bankruptcy Code.

13.      The terms of the Stalking Horse APA are summarized herein[2]:

    a.      Proposed Purchaser: Schaedler/Yesco or its designee.

    b.      Purchased Assets: On the Closing Date and subject to the terms and conditions of the Stalking Horse APA and subject to the approval of the Bankruptcy Court pursuant to sections 105, 363 and 365 of the

_____

[2] Capitalized terms used in Paragraph 16 but not otherwise defined shall have the meaning ascribed to them in the Stalking Horse APA.

Bankruptcy Code, Seller shall sell, assign, transfer, convey and deliver to Purchaser, free and clear of all liens, claims and interests, and Purchaser shall acquire, all of Seller's right, title and interest in and to the Acquired Assets existing on the Closing Date, to the extent not included among the Excluded Assets.

c.    Excluded Assets: All accounts receivable not related to any Transferred Contract including all accounts receivable due Seller from Buyer, Buyer's Affiliate or Buyer's Subsidiary, all inventory, all capital stock and other equity interests of Seller; all cash on hand; all insurance policies and binders and, except to the extent otherwise included as part of the Acquired Assets, refunds and credits from insurance policies or binders due or to become due with respect to such policies or binders; all of Seller's rights under the Stalking Horse APA or any Related Agreement; any claims by any Seller against any other Seller; all Causes of Action arising out of or related to the Excluded Assets; all Avoidance Actions; all Contracts set forth as excluded on Section 1(h) of the Disclosure Schedule (the "Excluded Contracts"); all Leases set forth as excluded on Section 1(i) of the Disclosure Schedule (the "Excluded Leases"); those items set forth on Section 1(j) of the Disclosure Schedule under the heading "Other Excluded Assets" (as amended or supplemented from time to time in accordance with the Stalking Horse APA).

d.    Assumed Liabilities: The Purchaser shall assume the obligations of Seller under the Transferred Contracts including all Cure Costs, as described in the definition of "Assumed Liabilities" in the Stalking Horse APA and in Section 2.2 thereof.

e.    Excluded Liabilities: The Purchaser shall not assume or become responsible for any of Seller's duties, obligations or liabilities that are not expressly assumed by Purchaser pursuant to the terms of the Stalking Horse APA.

f.    Purchase Price: Cash in the amount of $1,525,089, plus (b) the assumption of the Assumed Liabilities.

g.    Cure Costs: Seller shall, at or prior to Closing, comply with all requirements under Bankruptcy Code section 365 to assign to Buyer the Transferred Contracts. At Closing, (x) Seller shall, pursuant to the Sale Order and the Assignment and Assumption Agreement(s), Lease Assignment Agreement and other transfer and assignment documents requested by Buyer, assume and assign to Buyer each of the Transferred Contracts and (y) Buyer shall pay promptly all Cure Amounts (if any) in connection with such assumption and assignment (as agreed to between Buyer and the non-Seller counterparty to the Transferred Contract or as

determined by the Bankruptcy Court) and assume and agree to perform and discharge the Assumed Liabilities (if any) under the Transferred Contracts, pursuant to the Assignment and Assumption Agreement(s) or Lease Assignment Agreement.

h.  Closing Date: A date that is on or before five (5) days from entry of the Sale Order.

i.  Bankruptcy Court Matters: The Stalking Horse APA is subject to approval by the Bankruptcy Court and the consideration by the Debtor of higher or better competing bids.

j.  Break-Up Fee and Expense Reimbursement: Subject to the approval of the Bankruptcy Court, in the event that the Stalking Horse APA is terminated pursuant to Section 8.1(e) of the APA because, an Alternative Transaction is consummated by Seller and for no other reason, Buyer shall be entitled to a break-up fee from the closing of the sale of the Acquired Assets to any entity other than the Buyer or an affiliate of the Buyer of $15,250.00 (the "Break-up Fee") and up to $30,000.00 of the actual, reasonable and documented expenses of Buyer incurred in connection with the negotiation, execution and preparation for the consummation of the transactions contemplated by the Stalking Horse APA (the "Expense Reimbursement") to compensate the Buyer for its participation in the sale process in submitting the Stalking Horse Bid; provided, however, that the Break-up Fee shall not be due and payable if the Buyer shall have breached any of its obligations, representations, or warranties contained in the Stalking Horse APA in any material respect. The Break-Up Fee and Expense Reimbursement are hereinafter collectively referred to as the "Termination Fee". Payment of the Termination Fee is the sole remedy of the Buyer and Buyer shall not have any other remedy or cause of action under or relating to the Stalking Horse APA or under any applicable law. The obligation to make any payment on account of the Termination Fee shall be entitled to administrative priority expense status, equal to all other administrative expense claims under Section 503(b) of the Bankruptcy Code, until such payment is made but shall be solely payable from the proceeds from the sale of the Acquired Assets and no other assets of the Seller or the Seller's estate.

k.  Offer of Employment to Kenneth Field. Terms still being negotiated between Kenneth Field and Buyer. Kenneth Field shall have delivered to Buyer an executed independent contractor agreement for a two (2) year term, with compensation of $135,000 per year. The independent contractor agreement shall also include the following: (i) a non-compete and non-solicitation covenants, whereby he will not be permitted to work or have an ownership interest in an energy supply, distribution or service

5

business, other than for Buyer, during his engagement with Buyer, within fifty (50) miles of the Buyer's primary place of business. This covenant would also preclude solicitation of Buyer's employees and clients during such time period, and (ii) he will agree to maintain the required trade licenses for Buyer for a period of two (2) years following the Closing. Buyer will be responsible to pay ordinary business expenses associated with the maintenance of the trade licenses. In the event Buyer does not have a licensed employee after two (2) years, subject to a mutually acceptable agreement, he will continue his engagement thereafter and maintain the required trade licenses until such time as Buyer is properly licensed.

l.      Offer of Employment to Brendon Field.  Terms still being negotiated between Brendon Field and Buyer.  Brendon Field shall have delivered to Buyer an executed independent contractor agreement for a three (3) year term, with compensation of $135,000 per year.  The independent contractor agreement shall also include the following: a non-compete and non-solicitation covenants, whereby he will not be permitted to work or have an ownership interest in an energy supply, distribution or service business, other than for Buyer, during his employment with Buyer, within fifty (50) miles of the Buyer's primary place of business. This covenant would also preclude solicitation of Buyer's employees and clients during such time period

m.      Offer of Employment to Remaining Employees.  Buyer has the right to interview and make offers of employment to the existing employees of Seller contingent on Buyer purchasing the assets of Seller.

n.      Contingencies to Seller's obligation to Close.  Buyer's obligation to close on the transactions is subject to satisfaction or waiver of the conditions set forth in Section 7.1 of the Stalking Horse APA summarized as follows: (a) representations and warranties set forth in Article III are true and correct, (b) Seller shall have performed and complied with its respective covenants and agreements; (c) Bankruptcy Court (i) shall have entered Bidding Procedures Order, (ii) no order staying, reversing, modifying or amending such order shall be in effect as of Closing, and (iii) the Sale Order shall not be subject to challenge of Buyer's good faith under section 363(m) of the Bankruptcy Code, (iii) no injunction shall be in effect that enjoins closing, (iv) deliveries from Buyer under Section 2.5(a)(ii) have been delivered, (v) Seller has complied with Sections 1113 and 1114 of the Bankruptcy Code, (vi) Seller shall have assumed each applicable Transferred Contract, (v) Cure Costs required to be funded by Buyer have been funded, (vi) Kenneth Field shall have delivered an executed independent contractor agreement for a two year period, with compensation of $135,000 per year and with a non-compete and non-

6

solicitation covenants as set forth in Section 7.1(i); (vii) Brendon Field shall have delivered an executed independent contractor agreement for a two year period, with compensation of $135,000 per year and with a non-compete and non-solicitation covenants as set forth in Section 7.1(j), and (viii) LaraLynn and Buyer shall have entered into a triple net lease agreement for the Property for a minimum term of five (5) years with monthly base rent fixed at $9,300.00. Buyer shall have the right to waive any of the conditions set forth in Section 7.1.

25.    The Debtor seeks authority to sell the Acquired Assets to Schaedler on the terms and conditions set forth in Stalking Horse APA. The Bidding Procedures and Stalking Horse APA envision the following timeline:

    a.    Approval of Bidding Procedures:  **July 26, 2018**

    b.    Sale Notice:  two business days after entry of Bid Procedures Order

    c.    Cure Notice:  two business days after entry of Bid Procedures Order

    d.    Pre-Qualification of Bidders:  **August 15, 2018**

    e.    Bid Deadline: **August 17, 2018**

    f.    Auction: **August 20, 2018**

    g.    Objection to Cure Amounts/Assumption:  **August 21, 2018**

    h.    Sale Objection Deadline:  **August 21, 2018**

    i.    Sale Hearing:  **August 23, 2018**

26.    The Debtor believes that the sale of the Acquired Assets will maximize value for the benefit of all its creditors.

B.    Proposed Bidding Procedures

27.    The Bidding Procedures are intended to facilitate a fair and efficient competitive sale process for all or any part of the Debtor's assets, consistent with the timeline of this case, to

enable the Debtor to promptly identify the highest or otherwise best offer for its assets.

28.    The following is a summary of the significant terms of the Bidding Procedures:

a.    Qualification: The Debtor will review each Bid received from a Bidder to determine, in its sole discretion whether it meets certain requirements, including those with respect to: good faith deposit; cash purchase price; written bid/same or better terms; bid deadline; proof of financial ability to perform; contingencies; irrevocable; and adequate assurance of future performance. A Bid received from a Bidder before the Bid Deadline that meets the requirements, as determined by the Debtor, shall constitute a "Qualified Bid," and such Bidder shall constitute a "Qualified Bidder." The Debtor shall inform Bidders whether or not their Bids have been designated as Qualified Bids no later than one (1) business day after such Bids are received. Notwithstanding anything herein to the contrary, the Stalking Horse APA shall be deemed a Qualified Bid, and Schaedler is a Qualified Bidder for the Auction.

b.    Backup Bidders: If for any reason the Prevailing Bidder fails to timely close on the sale of the Acquired Assets, the Debtor shall have the right (without the requirement of further notice to any party) to close the sale of the Acquired Assets to the bidder submitting the second highest bid designated at the Auction (the "Backup Bidder(s)") in accordance with the terms of the Asset Purchase Agreement submitted by the bidder submitting the second highest bid. All other Qualified Bidders shall be required to make their bids irrevocable until five (5) business days from the date of the Sale Hearing so that their bids may be considered as the backup bid.

c.    Provisions Governing the Auction: In the event the Debtor receives one or more Qualified Bids (in addition to the bid of the Stalking Horse Bidder), the Debtor will conduct an auction sale (the "Auction") at which the Stalking Horse Bidder, and other parties that have submitted Qualified Bids may participate.

29.    The Debtor will consider all proposals that are deemed Qualified Bids in accordance with the Bidding Procedures, and will consider proposals for the acquisition of substantially all of the Acquired Assets in a single sale to a single Qualified Bidder. The Debtor reserves the right, as is reasonably appropriate to maximize the value realized by the estate from the proposed sale, to extend deadlines contained herein and to establish procedures

and rules during the Auction, so long as such alterations, procedures and rules are not

inconsistent with the Bidding Procedures Order.

30.    The Debtor will present the results of the Auction to the Court at the Sale

Hearing on **August 23, 2018** or as soon as the Court is available, at which time certain findings

will be sought from the Court regarding the Auction, including, among other things, that: (a) the

Auction was conducted and the Prevailing Bidder(s) was properly selected in accordance with

these Bidding Procedures; (b) the Auction was fair in substance and procedure; and (c)

consummation of the asset sale(s) by the Prevailing Bidder(s) will provide the highest or

otherwise best value for the assets and is in the best interests of the Debtor, its estate and

creditors. The Debtor believes that the Bidding Procedures are fair and reasonable, and are not

likely to dissuade any serious potential purchaser from bidding.

C.    Notice of Auction and Sale

31.    The Debtor seeks to have the Auction on **August 20, 2018**. Within two (2)

business days of entry of the Bidding Procedures Order, the Debtor will serve by first class mail,

copies of (i) the Bidding Procedures Order and (ii) the Sale Notice, attached as Exhibit 2 to the

Bidding Procedures Order, upon the following entities: (a) secured creditors holding liens against

any portion of the Acquired Assets; (b) the Office of the United States Trustee; (c) counsel to the

Stalking Horse Bidder; (d) twenty largest unsecured creditors; (e) all parties in interest who have

requested notice pursuant to Bankruptcy Rule 2002; (f) all applicable federal, state and local

taxing and regulatory authorities of the Debtor or recording offices or any other governmental

authorities that, as a result of the sale of the Acquired Assets, may have claims, contingent or

otherwise, in connection with the Debtor's ownership of the Acquired Assets or have any known

interest in the relief requested by the Motion; and (g) all counterparties to any executory contract

9

or unexpired lease of the Debtor (collectively, the "Sale Notice Parties").

32.     The Debtor further requests, pursuant to Bankruptcy Rule 9014, that objections, if any, to the proposed Sale: (a) be in writing; (b) be filed with the Clerk of the United States Bankruptcy Court for the Eastern District of Pennsylvania no later than **August 21, 2018** (Eastern Daylight Time); and (c) be served on (i) the Debtor; (ii) counsel to the Debtor; (iii) secured creditors holding liens against any portion of the Acquired Assets; (iv) counsel to the Stalking Horse Bidder; (v) the US Trustee; (vi) twenty largest unsecured creditors; and (vii) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002.

D.     Provisions Relating to Executory Contracts and Unexpired Leases Including Determination of Cure Amounts and Deadlines for Objection to Assumption and Assignment of All Contracts

33.     The Debtor also seeks to establish (a) procedures for determining the "Cure Amounts",[3] and (b) the deadline for objections to the Cure Amounts and/or the proposed assumption and assignment of executory contracts and unexpired leases (collectively, the "Contract Procedures").

34.     Seller provided to Buyer a schedule (the "Contracts Schedule") setting forth (A) each Contract, Lease or Real Property Lease to which any Seller is a party or by which any Seller is bound and that is used in, useful in or related to the Business or any of the Acquired Assets, (B) all Cure Amounts (if any) for each such Contract, Lease or Real Property Lease and (C) a description of each such Contract, Lease or Real Property Lease. Within two (2) business days after the Bid Procedure Order is entered by the Court, Debtor will send a notice to each counterparty for a Contract, Lease or Real Property Lease on the Contracts Schedule setting forth the proposed Cure Amounts (if any) for such Contracts, Leases, and Real Property

---

[3] Unless otherwise stated, capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Stalking Horse APA.

Lease (the "Cure Notice").  The Cure Notice, will be substantially in the form attached as Exhibit 3 to the Bidding Procedures Order, Seller shall (x) set forth the procedures for the assumption and assignment of Contracts, Leases or Real Property Leases, and (y) notify counterparties that their Contracts, Leases, or Real Property Leases may be assumed or rejected as of the Closing Date.

35.     Any objection to the Cure Amount or to the assumption and assignment to the Stalking Horse Bidder, including with respect to adequate assurance of future performance of the Stalking Horse Bidder (collectively, a "Contract Objection"), must be filed with the Court no later than **August 21, 2018** (the "Contract Objection Deadline"), and served, so as to be received the same day as the objection is filed, on (i) the Debtor; (ii) counsel to the Debtor; (iii) secured creditors holding liens against any portion of the Acquired Assets; (iv) counsel to the Stalking Horse Bidder; (v) the US Trustee; (vi) twenty largest unsecured creditors; and (vii) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002.

36.     To facilitate a prompt resolution of (i) disputes relating to the Cure Amounts and (ii) any other objections relating to the assumption and assignment of the Contracts, Leases or Real Property Leases, the Debtor proposes the following procedures:

a.     Any Contract Objection must state the basis for such objection and state with specificity what Cure Amount the party to the Transferred Contract believes is required (in all cases with appropriate documentation in support thereof). If no Contract Objection is timely received, the Cure Amount set forth in the Cure Notice shall be controlling, notwithstanding anything to the contrary in the Transferred Contract or other documents as of the date of the Cure Notice. The Cure Notice shall also provide that the Contract Objection to any Cure Amount or assumption and assignment will be heard at the Sale Hearing or at a later hearing, as determined

11

by the Prevailing Bidder. If a Prevailing Bidder that is not the Stalking Horse Bidder prevails at the Auction, then the deadline to object to assumption and assignment only (solely on the grounds of adequate assurance of future performance) shall be extended to the Sale Hearing.

b.     Unless a non-Debtor party to any Transferred Contract files an objection to the Cure Amount by the applicable objection deadline, then such counterparty shall be:

i.     forever barred from objecting to the Cure Amount and

ii.     forever barred and estopped from asserting or claiming any Cure Amount, other than the Cure Amount on the schedule of the Cure Notice, against the Debtor or the Stalking Horse Bidder or any other assignee of the relevant contract or lease.

c.     Unless a non-Debtor party to any Transferred Contract files a timely objection to the assumption and assignment of the contract to the Stalking Horse Bidder, then such counterparty shall be deemed to have consented to the assumption and assignment to the Stalking Horse Bidder.

## RELIEF REQUESTED AND BASIS THEREFOR

37.     The Debtor requests that this Court, *inter alia*, (i) approve the Stalking Horse APA; (ii) approve the Bidding Procedures; (iii) schedule an auction sale, (iv) authorize the sale of the Acquired Assets to the Stalking Horse Bidder pursuant to the Stalking Horse APA or to another Prevailing Bidder (as defined in the Bidding Procedures) in accordance with the Bidding Procedures, free and clear of all liens, claims, and interests pursuant to Section 363(b), (f), (k), and (m), (v) approve the assumption and assignment of certain executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code, and (vi) grant such other and further relief as set forth in the Sale Order.

12

A.    Approval of the Bidding Procedures is Appropriate and in the Best Interests of the Debtor's Estate and its Creditors

38.    A paramount goal in any proposed sale of property of the estate is to maximize the proceeds received for the benefit of creditors. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that the debtor in possession "had a fiduciary duty to protect and maximize the estate's assets"); *Four B. Corp. v. Food Barn Stores, Inc. (In re Barn Stores,Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"). Courts recognize that procedures to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (noting that bid procedures "encourage bidding and . . . maximize the value of the debtor's assets").

39.    The Debtor submits that the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order provide a fair, orderly and uniform mechanism by which interested buyers can submit offers for the Acquired Assets and will produce a competitive and fair bidding process. The Debtor believes that the Bidding Procedures will promote active bidding from interested parties, are not likely to dissuade any serious potential bidder, and will result in the best and highest offer reasonably available for such assets. The Bidding Procedures are consistent with other procedures routinely approved by courts in this and other districts, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. *See In re Saint Michael's Medical Center, Inc., et al.,* Case No. 15-

13

24999 (Bankr. D.N.J. Nov. 13, 2015); *In re Crumbs Bake Shop, Inc., et al.*, Case No. 14-24287

(Bankr. D.N.J. July 25, 2014); *see also In re Dura Auto. Sys., Inc.*, No. 06-11202 (Bankr. D.

Del. July 24, 2007).

> i.    *Overbid Protections are Appropriate*

40.    The initial overbid amount and overbid increments are appropriate under the

circumstances and will enable the Debtor to simultaneously maximize value while limiting the

chilling effect in the marketing process. This provision also is consistent with the overbid

increments previously approved by courts in this circuit. *See, e.g., In re Seastar Holdings, Inc.*,

Case No. 18-10039 (Bankr. D. Del. Jan. 29, 2018); *In re Peekay Acquisition, LLC*, Case No. 17-

11722 (Bankr. D. Del. Sep. 7, 2017).

> ii.    *The Breakup Fee and Expense Reimbursement Should be Approved*

41.    Bid incentives such as the Termination Fee encourage a potential buyer to invest

the time, money and effort required to negotiate with a debtor, and perform the necessary due

diligence attendant to the acquisition of the assets of a debtor, despite the inherent risks and

uncertainties of the chapter 11 process. The Debtor submits that approval of the Termination Fee

is justified by the facts and circumstances of these cases, whether considered under the business

judgment rule or administrative expense rule. Moreover, the Termination Fee is a material

inducement for, and condition of, the Stalking Horse Bidder's entry into the Stalking Horse APA.

The Stalking Horse Bidder has put forth considerable time and resources to negotiate the

Stalking Horse APA, which will serve as a floor price at the Auction and, regardless of whether

other Qualified Bids are received, will benefit the Debtor's estate. The Debtor believes that the

Termination Fee is fair and reasonable in view of (a) the analysis and negotiation undertaken by

the Stalking Horse Bidder in connection with the transaction and (b) the fact that, if the

14

Termination Fee is triggered, the Stalking Horse Bidder's efforts will have influenced the chances that the Debtor will receive the highest or otherwise best offer for the Acquired Assets to the benefit of all of the Debtor's stakeholders.

42.    Approval of the Termination Fee is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999). In *O'Brien*, the Third Circuit concluded that "the determination whether bidding incentives are allowable under section 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of [these fees] . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *O'Brien*, 181 F.3d at 535. In *O'Brien*, the Third Circuit identified two instances in which such a benefit to the estate may be found. First, a benefit may be found if the bidding incentive promotes a more competitive bidding process, "such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, "if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

43.    In recognition of the expenditure of time, energy and resources as well as the benefits to the Debtor's estate of securing a "stalking horse" or minimum bid and setting a floor price at the Auction, promoting additional competitive bidding and by increasing the likelihood that the ultimate sale price will reflect the true value of the Acquired Assets, the Debtor submits that approval of the Termination Fee is warranted for the Stalking Horse Bidder. The Debtor's

15

ability to offer the Termination Fee enables the Debtor to ensure the sale of the Acquired Assets to a contractually-committed bidder at a price the Debtor believes to be fair while, at the same time, providing the Debtor with the potential of a greater return to the estate. Moreover, the Stalking Horse Bidder has spent, and likely will continue to spend, considerable time, money and energy pursuing the Sale and has engaged in extended and lengthy good faith negotiations under extremely stressful time pressures.

44.    The Debtor and the Stalking Horse Bidder each have acted in good faith throughout this process. The amount of the Termination Fee (Break-Up Fee, $15,250, and Expense Reimbursement of up to $30,000 of the actual, reasonable and documented expenses of Buyer ), is not so high that it would cause any chilling effect on other prospective buyers, and will have no adverse effect on any creditors.

45.    Absent authorization of the payment of the Termination Fee, the Debtor might lose the opportunity to obtain the highest and best available offer for the Acquired Assets and the downside protection that will be afforded by the Stalking Horse APA. The Stalking Horse Bidder has provided a material benefit to the Debtor and its creditors by increasing the likelihood that the Debtor will receive the best possible price for the Acquired Assets. Furthermore, approval of the Bidding Procedures, including the Termination Fee, is required by the Stalking Horse APA as a condition to the Stalking Horse Bidder's obligation to proceed with the transaction contemplated in the Stalking Horse APA. *See In re Reliant Energy Channelview, L.P.*, 594 F.3d 200 (3d Cir. 2010).

46.    In light of the benefit to the Debtor's estate that will be realized by having a signed purchase agreement, enabling the Debtor to preserve the value of its estate and promote more competitive bidding, ample support exists for the approval of the Termination Fee. The

16

Debtor's payment of the Termination Fee under the circumstances described herein is (i) an actual and necessary cost and expense of preserving the Debtor's estate, within the meaning of Bankruptcy Code section 503(b); (ii) of substantial benefit to the Debtor's estate and (iii) reasonable and appropriate in light of the efforts and the significant due diligence costs and expenses that have been and will be expended by the Stalking Horse Bidder. Thus, the Debtor requests that the Court approve and authorize payment of the Termination Fee pursuant to the terms of the Stalking Horse APA.

B.      The Form and Manner of Notices Should Be Approved

47.     The Debtor is required to notify creditors of the Auction and the sale, including a disclosure of the date, time, and place of the Auction, the terms and conditions of the sale, the date, time, and place of the Sale Hearing, and the deadlines for filing any related objections. The Debtor submits that the Sale Notice, substantially in the form attached as Exhibit 2 to the Bidding Procedures Order, complies with Bankruptcy Rule 2002 and provides reasonable, timely and adequate notice of the proposed Sale, the Bidding Procedures, the Auction, and the Sale Hearing, and the relevant deadlines for any objections thereto, to the Debtor's creditors and all other parties-in-interest that are entitled to such notice. Further, the Debtor's proposed sale objection deadline is reasonable and appropriate under the circumstances, and provides parties in interest with adequate notice in accordance with the Bankruptcy Rules and the Local Rules.

48.     Accordingly, the Debtor requests that the Court approve the notice procedures and objection deadlines set forth in this Motion, including the form and manner of service of the Sale Notice, and that no other or further notice of the Sale, the Bidding Procedures or the Auction is required.

C.    The Contract Procedures are Appropriate

49.    Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The Debtor respectfully submits that the proposed Contract Procedures are appropriate and reasonably tailored to provide the Contract Parties with adequate notice of the proposed assumption and assignment of the applicable Contract, as well as proposed Cure Amounts, if applicable. Such Contract Parties will then be given an opportunity to object to such notice. The Contract Procedures further provide that, in the event an objection is not resolved, the Court will determine related disputed issues (including any adequate assurance of future performance issues). Accordingly, the Debtor submits that implementation of the proposed Contract Procedures is appropriate in this chapter 11 case.

50.    The Contract Procedures comport with the requirements of Bankruptcy Code section 365 (as described fully below) and Bankruptcy Rule 6006, and the non-Debtor contract counterparties' rights to adequate assurance are unaffected and fully preserved. The Debtor respectfully submits that the notices required by the Contract Procedures are sufficient to assume and assign the Transferred Contracts because they are reasonably tailored to provide notice and an opportunity to object to the proposed assumption and assignment. Thus, the Debtor submits that the Contract Procedures should be approved.

D.    The Debtor Should Be Authorized to Sell its Assets Pursuant to Sections 105(a) and 363(b)(1) of the Bankruptcy Code

51.    Section 363(b)(1) of the Bankruptcy Code governs sales of assets outside the ordinary course of business and provides as follows: "The trustee [or debtor-in-possession],

18

after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).[4]

52.      Section 105(a) provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

53.      Although the Bankruptcy Code does not articulate the standard for approving a sale of assets (other than requiring notice and a hearing), the United States Court of Appeals for the Third Circuit in the seminal case of *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986) interpreted Section 363(b)(i) to require a finding by the Bankruptcy Court that the acquirer of a debtor's assets be a good faith purchaser. The Third Circuit construed the "good faith purchaser" standard to mean one who purchases "in good faith" and for "value." *Abbotts Dairies*, 788 F.2d at 147.

54.      The Third Circuit in *Abbotts Dairies* then analogized the bona fides of a Section 363(b)(1) purchaser to a buyer at a judicial sale:  The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.  *Abbotts Dairies*, 788 F.2d at 147 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

55.      Respectfully, the sale of the Acquired Assets in accordance with the Stalking Horse APA and Bidding Procedures satisfies the *Abbotts Dairies* test.  First, the Debtor has

---

[4] Federal Rule of Bankruptcy Procedure 6004 authorizes sales outside of the ordinary course of business to be conducted privately or by public auction. Fed. R. Bankr. P. 6004(f)(1).

fully disclosed and requested the Court's approval of the Bidding Procedures and all the terms and conditions of the Sale and proposed Auction, and intends to provide comprehensive notice of the Sale as discussed below. *See In re Colony Hill Assoc.*, 111 F.3d 269 (2d Cir. 1997) (determination of "good faith" is based on traditional equitable principles, including whether there has been full disclosure to the Bankruptcy Court). The Debtor negotiated in good faith with the Stalking Horse Bidder at arms-length, ultimately leading to the execution of the Stalking Horse APA.

56.    The Debtor believes that the Purchase Price for the Acquired Assets represent reasonably equivalent value and fair consideration for the Acquired Assets.

57.    In addition to the *Abbotts Dairies* requirements (which, respectfully, the Debtor clearly satisfies), courts typically require a sound business purpose to sell assets outside of a plan of reorganization. *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); *In re Conroe Forge & Mfg. Corp.*, 82 B.R. 781, 783-86 (Bankr. W.D. Pa. 1988); *In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15,21 (Bankr. E.D. Pa. 1987). Courts consider the following non-exhaustive list of factors in determining whether a sound business purpose exists: (a) sound business reason for the sale; (b) accurate and reasonable notice; (c) proportionate value of the asset to the estate as a whole (fair and reasonable); (d) the amount of elapsed time since the filing; (e) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (f) the effect of the proposed disposition on the future plan; (g) the amount of proceeds to be obtained from the sale versus the appraised value of the property sold; and (h) whether the asset is decreasing or increasing in

20

value. *Lionel Corp.*, 722 F.2d at 1071; *Del. & Hudson Ry.*, 124 B.R. at 176; *In re Weatherly*

*Frozen Food Grp., Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992). A debtor's showing of

sound business justification need not be unduly exhaustive. Rather, a debtor is "simply required

to justify the proposed disposition with sound business reason." *In re Baldwin United Corp.*, 43

B.R. 888, 906 (Bankr. S.D. Ohio 1984).

58.    Consideration of the above factors here unequivocally establishes that the Sale

should be approved.  The Debtor has proposed Bidding Procedures designed to maximize the

purchase price for the Acquired Assets. Those Bidding Procedures and the form and manner of

notice of the Sale will ensure that any and all interested parties will receive adequate notice of

the Auction to allow for a competitive sale process.

59.    Absent the Sale, whether to the Stalking Horse Bidder or to another party, the

Debtor will have to close its operations, employees will lose their jobs, and the prepetition

secured creditors, will incur significantly greater losses if they have to liquidate their collateral in

a disorderly, piecemeal fashion. For all these reasons, the Debtor respectfully submits that the

Sale of the Acquired Assets is supported by sound business reasons and is in the best interests of

the Debtor and its estate. Accordingly, the Debtor requests approval of the Sale to the Stalking

Horse Bidder pursuant to section 363(b) of the Bankruptcy Code.

E.    The Debtor Should be Authorized to Sell its Assets Free and Clear of Liens, Claims  and
Interests Pursuant to Section 363(f) of the Bankruptcy Code

60.    The Bankruptcy Code authorizes a debtor-in-possession to sell property of the

estate under section 363(b) free and clear of any interest or lien in such property if one of the

following five criteria is met:

a.    applicable non-bankruptcy law permits sale of such property free and clear

21

of such interest;

      b.     such entity consents;

      c.     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

      d.     such interest is in bona fide dispute; or

      e.     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

61.     This statute authorizes the sale of assets "free and clear of any interest." The term "any interest," as used in section 363(f), is not defined in the Bankruptcy Code. The Third Circuit Court of Appeals specifically addressed the scope of the term "any interest" in *Folger Adam Sec. v. DeMatteis/MacGregor*, JV, 209 F.3d 252, 258 (3d Cir. 2000). The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards a "broader interpretation which includes other obligations that may flow from ownership of the property." *Id.* at 258. In turn, the Folger Adam Court cited with approval the Fourth Circuit's ruling in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 58 1-82 (4th Cir. 1996) for the proposition that debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

62.     The Debtor submits that one or more of the conditions set forth in section 363(f) of the Bankruptcy Code will be satisfied with respect to the sale of the Acquired Assets. In particular, section 363(f)(2) will be met in connection with the transactions proposed because the Debtor expects that each of the parties holding liens, claims or interests on the Acquired Assets

will consent, or absent any objection to this Motion, will be deemed to have consented to, the

Sale.

63.    Accordingly, the Debtor requests that the Acquired Assets be sold and

transferred to the Stalking Horse Bidder free and clear of all Liens and Claims pursuant to

section 363(f) of the Bankruptcy Code (other than Liens and Claims specifically assumed or

created by the Stalking Horse Bidder).

F.     Good Faith Under Section 363(m) of the Bankruptcy Code; Sale Not In Violation of
       Section 363(n) of the Bankruptcy Code

       64.    Section 363(m) of the Bankruptcy Code provides:

              The reversal or modification on appeal of an authorization under
              subsection (b) or (c) of this section of a sale or lease of property
              does not affect the validity of a sale or lease under such
              authorization to an entity that purchased or leased such property in
              good faith, whether or not such entity knew of the pendency of the
              appeal, unless such authorization and such sale or lease were
              stayed pending appeal.

11 U.S.C. § 363(m).

       65.    Section 363(n) of the Bankruptcy Code, among other things, provides that a

trustee may avoid a sale under such section if the sale price was controlled by an agreement

among potential bidders at the sale. The Third Circuit in *Abbotts Dairies* noted the kind of

misconduct that would destroy a buyer's good faith. *Abbotts Dairies*, 788 F.2d at 147.

       66.    The Stalking Horse APA represents a negotiated, arm's-length transaction, in

which the Stalking Horse Bidder has acted in good faith, without collusion or fraud of any kind.

The transaction contemplated under the Stalking Horse APA is valued in excess of $1.5 million.

The Purchase Price is higher than what the Debtor believes it could recover in a liquidation.

Therefore, the Debtor respectfully requests that the Court find that the Purchaser has purchased

the Acquired Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code,

and is entitled to the protections of sections 363(m) and 363(n) of the Bankruptcy Code as

reflected in the Sale Order. If a party other than the Stalking Horse Bidder emerges as the

Prevailing Bidder, the Debtor intends to make the appropriate showing at the Sale Hearing that

such Prevailing Bidder satisfies the requirements of "good faith" and similarly is entitled to relief

under sections 363(m) and 363(n).

G.   The Debtor Should Be Authorized to Assume and Assign the Transferred Contracts and
     Real Estate Leases

67.   Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor-in-

possession "subject to the court's approval, may assume or reject any executory contract or

[unexpired] lease of the debtor." 11 U.S.C. $ 365(a). The standard governing bankruptcy court

approval of a debtor's decision to assume or reject an executory contract or unexpired lease is

whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g.,*

*In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's

business judgment has been reasonably exercised, a court should approve the assumption or

rejection of an unexpired lease or executory contract. *See Group of Institutional Investors v.*

*Chicago M St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *Sharon Steel Corp.*, 872 F.2d 36,39-40

(3d Cir. 1939). The business judgment test "requires only that the trustee [or debtor-in-

possession] demonstrate that [assumption or] rejection of the contract will benefit the estate."

*Wheeling Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel*

*Corp.)*,72 B.R. 845,846 (Bankr. W.D. Pa. 1987) (quoting *Stable Mews Assoc.*, 41 8.R. at 596).

Any more exacting scrutiny would slow the administration of a debtor's estate and increase

costs, interfere with the Bankruptcy Code's provision for private control of administration of

24

the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, NA.*, 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to Bankruptcy Code section 365(b)(1), for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. $ 365(b)(1).

68.    Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract. *See In re Rickel Home Centers, Inc.*, 209 F.3d 291,299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

69.    Bankruptcy Code section 365(f) provides, in pertinent part, that a trustee may assign an executory contract or unexpired lease of a debtor only if:

> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

70.    Bankruptcy Code section 365(a) provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Moreover, Bankruptcy Code section 365(b) codifies the requirements for assuming an executory contract of a debtor. This provision provides that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such

contract or lease unless, at the time of assumption of such contract or lease, the trustee –

> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default... ;

> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

71. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.

72. As set forth in the Stalking Horse APA (or as shall be set forth in any Qualified Bid), to the extent any defaults exist under any Transferred Contracts such defaults are required to be cured as required under Bankruptcy Code section 365(b)(1).

73. Based on information received from the Stalking Horse Bidder, the Debtor believes that the Stalking Horse Bidder has the financial capability to satisfy any and all obligations it will incur in connection with the Transferred Contracts. Under the Bidding Procedures, to be a Qualified Bid, any Qualified Bidder must also establish that it has the financial capability to satisfy any and all obligations it will incur in connection with the Transferred Contracts. Additionally, facts will be further adduced at the Sale Hearing to show the financial credibility of the Stalking Horse Bidder or the Prevailing Bidder, their experience in the industry and their willingness and ability to perform under the Transferred Contracts. Because

the Sale Hearing will provide the Court with an opportunity to evaluate the ability of the Stalking

Horse Bidder or the Prevailing Bidder to provide adequate assurance of future performance

under the Transferred Contracts, as required by Bankruptcy Code section 365(b)(1)(C), the

Debtor submits that the Court should authorize the assumption and assignment of the Transferred

Contracts by the Debtor, effective upon Closing of the Sale.

74.    Additionally, the Bidding Procedures provide that all of the counterparties to

Contracts with the Debtor will be given notice of this Motion and through the Cure Notice will

have been provided with notice of the potential assumption and assignment of their Contract

and the Debtor's proposed Cure Amounts associated therewith. Moreover, the designation

procedures are an adequate mechanism to assume and/or reject Contracts, particularly where,

as here, all Cure Amounts will be paid by the Stalking Horse Bidder or the Prevailing Bidder at

Closing.

75.    Based on the foregoing, the Debtor respectfully submits that the assumption and

assignment of the Transferred Contracts satisfies the requirements under Bankruptcy Code

section 365(f)(2)(A) and (B).

H.    Request For Relief Under Bankruptcy Rules 6004(h) and 6006(d)

76.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or

lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the

court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing

the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of

14 days after the entry of the order, unless the court orders otherwise." The Debtor requests that

the Bidding Procedures Order be effective immediately by providing that the fourteen 14 day

stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

Case 18-14790-ref    Doc 10    Filed 07/20/18    Entered 07/20/18 12:11:07    Desc Main
Document    Page 28 of 30

77.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Banks. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy ¶¶ 6004.11, 6006.04 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the Court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

78.    Based upon the foregoing, the Debtor submits that the relief requested herein is necessary and appropriate, is in the best interests of the Debtor and its estate, and should be granted in all respects.

79.    No prior request for the relief sought herein has been made to this or to any other court.

80.    The Debtor lacks adequate capital and financing to be able to capitalize on opportunities that are available in the marketplace for new work.  This is further enhanced by the fact that the Debtor's is unable to obtain bonds for new work.  The Debtor has also concluded that it cannot continue the business as presently structured and generate sufficient revenue to timely satisfy its debt obligations.  Faced with this reality, the Debtor has determined that a prompt sale of the Acquired Assets as a "going concern" is in the best interest of the Debtor and its estate.

28

**WHEREFORE**, the Debtor respectfully requests that the Court grant the Motion by entering the Bidding Procedures Order and Sale Order, and such other relief as the Court deems just and appropriate under the circumstances.

**Respectfully Submitted,**

**KARALIS PC**

Dated: July 20, 2018                    By:____/s/ Aris J. Karalis_____
                                                    ARIS J. KARALIS
                                                    ROBERT W. SEITZER
                                                    1900 Spruce Street
                                                    Philadelphia, PA 19103
                                                    Proposed Attorneys for the Debtor

## <u>LIST OF EXHIBITS TO SALE MOTION</u>

EXHIBIT "A"          BIDDING PROCEDURES ORDER

- EXHIBITS TO BIDDING PROCEDURES ORDER

  o     EXHIBIT "1"          BID PROCEDURES

  o     EXHIBIT "2"          SALE NOTICE

  o     EXHIBIT "3"          CURE NOTICE WITH RESPECT TO EXECUTORY CONTRACTS POTENTIALLY TO BE ASSUMED

  o     EXHIBIT "4"          STALKING HORSE APA

EXHIBIT "B"          SALE ORDER (to be provided before Sale Hearing)